## WILLIAM ORT v. MARY FOWLER.

1. NEGLIGENT *Maker of Note; Liability.* Where a party, in full possession of all his faculties and able to read, even though slowly and with difficulty, signs a negotiable and promissory note under the belief that it is an instrument of a different character, and does so without himself reading the instrument, but relying on the reading and representations of a stranger, *held*, that the execution of the note under these circumstances is such negligence on his part as will render him liable thereon to a *bona fide* holder.

2. HANDWRITING; *Competent Witness.* One who has for a considerable time been engaged in a business which necessitates the frequent comparison of handwritings, and who shows that he has in fact been in the habit of making such comparisons, is qualified as an expert to testify as to the genuineness of a disputed signature by comparison with others admitted to be genuine.

3. FICTITIOUS FIRM, *Note to Order of.* Where a party executes a note to the order of a fictitious firm, and thereafter the holder indorses the note in the firm's name, a *bona fide* indorsee may recover against the maker, and this notwithstanding the latter was ignorant of the fact that the firm-name was fictitious.

4. ABILITY TO READ; *Proper Test.* Where the principal negligence charged against the defendant is the failure to read the instrument which he signed, when he had the ability to read, proof of the latter fact is important, and a practical test by handing him certain instruments and asking him to read them before the jury is both satisfactory and proper.

## *Error from Harvey District Court.*

ACTION by *Fowler* against *Ort*, upon a promissory note. Trial at the September Term, 1881, and verdict and judgment for plaintiff. Defendant brings the case to this court. The facts are stated in the opinion.

*John Reid,* for plaintiff in error.

*Greene & Shaver,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: February 7, 1881, Mary Fowler, as and for her bill of particulars, filed with a justice of the peace an instrument in writing, of which the following is a copy:

"$90.          MACON TOWN, KAS., Aug. 2, 1880.

"Six months after date, I promise to pay to the order of Wilson, Parks & Co. ninety dollars, for value received, with interest at the rate of 10 per cent. per annum from date. The payee reserves the right to extend the time of payment thereof if he desires.          WILLIAM ORT."

On the back of said instrument was the following: "Wilson, Parks & Co." A summons was issued by the justice and served upon the defendant. Defendant appeared, and before the trial filed with the justice his affidavit denying that there

then was or ever had been any firm, partnership, or corporation, doing business under the name of Wilson, Parks & Co.; denying that he ever had any dealings with any person or persons representing himself or themselves as such partnership or corporation; denying that any persons doing business under the name of Wilson, Parks & Co. indorsed or authorized the indorsement of such partnership or corporate name upon the back of the instrument sued on; and also denying the execution by him of the instrument sued on. April 1, 1881, the cause was tried before the justice and judgment rendered for plaintiff for the amount then due by the terms of said instrument. The defendant appealed to the district court, where, on October 5, 1881, a trial was had before the court and a jury, and a verdict and judgment were rendered for the plaintiff. Defendant's motion for a new trial being overruled, he brings the case here for review.

On the trial these uncontradicted facts appeared from the testimony of the defendant: On or about the day of the date of the note, a stranger came to where he was working alone in the field about half a mile from his house. The man represented himself as the state agent of Wilson, Parks & Co. for the sale of iron posts and wire fences, and after some conversation persuaded defendant to accept an agency for his township. What followed is thus narrated by defendant in his testimony:

"The man then filled up two contracts of agency. They were both of the same size and shape, and looked just alike. They were about half the size of an ordinary sheet of legal cap, with a border all around near the edge. I did not have my spectacles with me. I did not ask him for a written contract; he said he would do it himself. He said that as I hadn't my specs with me, he would read the contract. I held one in my hand and looked over his shoulder while he read. He did not read anything about a note, and I know they were not notes. We had no talk about signing notes. I could see a little better then than now, but I could not read without spelling out every word. I tried to follow him as he read. I expected him to read the contract right, as I could not spell it out good myself without my spectacles.

He read it just as we had talked.  I was to have a commission on all I sold, but I don't remember how much it was. The man then signed them, and then I signed them one at a time on the back of his book.  There were no other papers on the book at the time.  He then told me to take my choice, and I took one.  There was nothing said about a promissory note in connection with the contract of agency.  The contract does not say anything about a note, either.  It did not read that way.  I signed my name only twice, and that was to the two contracts.  I did not intend to and did not sign anything but the contracts.  We did not talk about signing anything else.  I know the papers I signed were just the same, and they said 'contract' or 'agreement' at the top.  I know they were not notes."

It is very evident from this and the other testimony that the defendant has been made the victim of an atrocious swindle.  Obviously this stranger, under the pretense of obtaining defendant's signature to two contracts, obtained his signature to this note, or else, having obtained his signature to the contracts, forged it to the note.  Clearly the defendant had no thought of signing a note, and did not suppose he was doing it.  The plaintiff claimed as a *bona fide* purchaser before maturity.  Now the first question which we deem important to consider is that presented by these two instructions:

"2.  The law is that where one of two innocent parties must suffer because of the fraud of another, that one must suffer who by his own negligence made it possible for the fraud to be committed.  If therefore you believe from the evidence that defendant negligently signed the note in question under the belief that he was signing an ordinary contract for the agency for the sale of certain wire-fence material in Halstead township, and delivered the same to the agent of Wilson, Parks & Co., and that said note was assigned to plaintiff for a valuable consideration and before it became due, and he knew nothing of the fraud practiced upon defendant at the time of the purchase of said note, then plaintiff is entitled to recover the amount of the note and interest, and this regardless of the fact whether there ever was such a firm in existence as the firm of Wilson, Parks & Co., or not.

"3.  If the note was procured from the defendant without

31 — 31 KAS.

any negligence on his part, by fraud and trickery and without any consideration, then plaintiff cannot recover; but the mere relying upon the reading and word of a stranger, if such was the fact, would be evidence of such negligence on the part of defendant as would make him liable for the amount of the note in the hands of an innocent holder for value."

There is no serious question as to the general proposition that, when one of two innocent parties must suffer by reason of the fraud of a third, that one must suffer who by his own negligence made it possible for the fraud to be committed. But the point of objection is in the affirmation that the mere relying upon the reading and word of a stranger is such negligence as will make the party so relying liable for the amount of the note in the hands of a *bona fide* holder. This presents a serious and doubtful question, one upon which courts have differed. A party is betrayed into signing a bill or note by the assurance that it is an instrument of a different kind. Under what circumstances ought he to be liable thereon? One view entertained is, that as he never intended to execute a bill or note, it cannot be considered his act, and he should not be held liable thereon any more than if his name had been forged to such an instrument. A second view is, that it is always a question of fact for the jury whether under the circumstances the party was guilty of negligence. A third is the view adopted by the trial court, that as matter of law, one must be adjudged guilty of such negligence as to render him liable who, possessed of all his faculties and able to read, signs a bill or note, relying upon the assurance or the reading of a stranger that it is a different instrument.

We approve of the latter doctrine. It presents a case, of course, of which one of two innocent parties must suffer; but the *bona fide* holder is not only innocent, but free from all negligence. He has done only that which a prudent, careful man might properly do, while on the other hand the maker of the note has omitted ordinary care and prudence. A party cannot guard against forgery; but if in possession of his faculties and able to read, he can know the character of every instrument to which he puts his signature; and it is a duty

which he owes to any party who may be subsequently affected by his act, to know what it is which he signs.   By his signature he invites the credence of the world to every statement and promise which is in the instrument he has subscribed; and he is guilty of negligence if he omits to use the ordinary means of ascertaining what those provisions and statements are.   If he has eyes and can see, he ought to examine; if he can read, he ought to read; and he has no right to send his signature out into the world affixed to an instrument of whose contents he is ignorant./ If he relies upon the word of a stranger, he makes that stranger his agent.   He adopts his reading as his own knowledge.   What his agent knows, he knows; and he cannot disaffirm the acts of that agent done within the scope of the authority he has intrusted to him.

In support of the views first suggested may be cited the cases of *Walker v. Ebert*, 29 Wis. 196; *Kellogg v. Steiner*, 29 id. 627; *Taylor v. Atchison*, 54 Ill. 196, though this case seems to have been rested on a statute, and to recognize the common law to be as held by us; *Puffer v. Smith*, 57 Ill. 527; *Wait v. Pomeroy*, 20 Mich. 425; *Gibbs v. Linabury*, 22 id. 479; *Soper v. Peck*, S. C. Mich., 17 N. W. Rep. 57; *Briggs v. Ewart*, 51 Mo. 245; *Cluse v. Guthrie*, 42 Ind. 227; *Detwiler v. Bish*, 44 id. 70.

In support of the view approved by us may be cited: 1 Daniel on Negotiable Insts., § 850; *Putnam v. Sullivan*, 4 Mass. 45; *Douglass v. Matting*, 29 Iowa, 498; *Chapman v. Rose*, 56 N. Y. 137; *Shirts v. Overjohn*, 60 Mo. 305; *Dinsmore v. Stimbert*, S. C. Nebraska, 11 N. W. Rep. 872; *Mackey v. Peterson*, S. C. Minn., 13 N. W. Rep. 132; *Hopkins v. Insurance Co.*, 57 Iowa, 206.

In 1 Daniel, *supra*, the author thus states the rule:

"The sixth class of cases are those in which the party possesses the ordinary faculties and knowledge, and is betrayed into signing a bill or note by the assurance that it is an instrument of a different kind.   It is generally agreed that if the party is guilty of any negligence in signing the paper, he is bound; and the act itself, it seems to us, can hardly be committed without negligence.   A man has no right to have

eyes and see not, or ears and hear not; and while the law should protect those who suffer from the want of the senses in their proper development, or ordinary education, it should not permit those who have both capacity and education to throw the burden of their failure to use them upon innocent third parties. In such cases we should say the act of signing the paper without intending to do so, imported negligence *per se,* and rendered the party liable."

In 60 Mo., the syllabus is as follows:

"Where it appears that the party sought to be charged intended to bind himself by some obligation in writing, and voluntarily signed his name to what he supposed to be the obligation he intended to execute, having full and unrestricted means of ascertaining for himself the true character of such instrument before signing it, but neglecting to avail himself of such means, and relying upon the representations of another as to the contents of the instrument, signed and delivered a promissory note instead of the instrument he intended to sign, he cannot be heard to impeach its validity in the hands of a *bona fide* holder."

The case from Minnesota is a strong case. In that it appeared that Peterson supposed he was signing a receipt for a plow — it was read to him by the agent, and read as such; Peterson could not read English, and there were no persons within a half-mile who could do so; the court excluded the evidence that it was obtained by fraud, on the grounds —

"That where a party, through neglect of precaution within his power, affixes his name to that kind of a paper without knowing its character, the consequent loss ought not to be shifted from him to a *bona fide* purchaser of the paper. Tested by this rule, the facts which defendant offered to prove would be no defense. He signed the paper voluntarily."

In 56 N. Y., the court, by Johnson, Judge, well says:

"To insure irresponsibility, only the utmost carelessness, coupled with a little friendly fraud, will be essential. Paper in abundance will be found afloat, the makers of which will have had no idea they were signing notes, and will have trusted readily to the assurance of whoever procured it that it created no obligation. To avoid such evils, it is necessary at least to hold firmly to the doctrine that he who, by his

carelessness or undue confidence, has enabled another to obtain the money of an innocent person, shall answer the loss. If it be objected that there must be a duty of care in order to found an allegation of negligence upon the neglect of it, it must be answered that every man is bound to know that he may be deceived in respect to the contents of a paper which he signs without reading. When he signs an obligation without ascertaining its character or extent, which he has the means to do, upon the representations of another, he puts confidence in that person; and if injury ensues to an innocent third person by reason of that confidence, his act is the means of the injury, and he ought to answer to it."

We think therefore the ruling of the district court in this respect was correct, and must be sustained.

The second question we shall notice is this: Plaintiff introduced the testimony of experts to prove by comparison of handwriting that the signature to the note was that of defendant. In respect to the genuineness of this signature six witnesses were introduced, two of whom testified that they were acquainted with the handwriting of defendant, while the others testified only from the comparison of this signature with certain other signatures admitted by defendant to be genuine. That this kind of testimony is competent, can no longer be considered an open question in this court. (*Macomber v. Scott*, 10 Kas. 335; *Joseph v. Bank*, 17 id. 256; *Abbott v. Coleman*, 22 id. 250.)

But the claim of counsel is, that these witnesses did not show themselves to be technically experts. Without attempting to notice the testimony of these witnesses, we may say in general that each of the four, with perhaps the exception of the county treasurer, H. W. Bunker, showed that he had been for a length of time engaged in a business which necessitated the comparisons of signatures, and that he had in fact been in the habit of making such comparisons. Whether in the case of the witness Bunker, the mere fact that he had been county treasurer was enough to show him familiar with the comparison of handwritings, and therefore competent as an expert, may be doubted; but as to the others, they were

clearly within the rule. It is not necessary, in order to make a man an expert, and qualified to testify as to the comparison of handwritings, that he should have made such comparisons a single specialty. It is enough that he has been engaged in some business which calls for frequent comparisons, and that he has in fact been in the habit for a length of time of making such comparisons. Of course the value of such testimony will vary with different witnesses, and this is a matter to be determined by the jury, after hearing the witnesses state the extent to which they have been in the habit of making such comparisons. It is enough now to say, that each of these witnesses, with perhaps the exception of the witness Bunker, was competent.

The third question we shall consider is this: The first instruction given was as follows:

"If the jury believe from the evidence that defendant signed the note in question, and delivered it to a person representing himself to be an agent of Wilson, Parks & Co., and that said person assigned and delivered the note to the agent of the plaintiff for a good consideration, and the plaintiff is now the owner and holder of the note, then you will find for the plaintiff for the amount of the note and interest."

In explanation of this instruction, it may be remarked that the party who obtained the note represented himself as the agent of Wilson, Parks & Co., a firm doing business in Quincy, Illinois, and that within a day or two after its execution plaintiff purchased the note from a party representing himself as the agent of such firm, who at the time indorsed the firm's name. The defendant in his affidavit of denial alleged that there was no such firm as Wilson, Parks & Co. He introduced the deposition of certain witnesses from Quincy, Illinois, tending strongly to show that there was no such firm at that place. There was no counter testimony, and no contradiction by plaintiff of such claim and testimony of defendant. It left the case in such condition that the court was justified in assuming that there was no such firm, that the payee's name therefore was fictitious. Under these circum-

stances the instruction was correct. (1 Daniel on Negotiable Insts., § 139; *Rogers v. Ware*, 2 Neb. 29; *Farnsworth v. Drake*, 11 Ind. 101; *Forbes v. Espy*, 21 Ohio St. 474; *Blodgett v. Jackson*, 40 N. H. 21; *Lane v. Krukle*, 22 Iowa, 399; *Phillips v. Im Thurn*, 114 English Com. Law, 694.)

In 1st Daniel, *supra*, the author thus expresses the rule:

"In the case of a note payable to a fictitious person, it appears to be well settled that any *bona fide* holder may recover on it against the maker as upon a note payable to bearer. It will be no defense against such *bona fide* holder for the maker to set up that he did not know the payee to be fictitious. By making it payable to such person he avers his existence, and he is estopped as against a holder ignorant of the contrary, to assert the fiction. . . . Where a note has as its payee a fictitious firm, and the holder indorses it, assuming the firm's name, a *bona fide* indorsee may recover against the maker."

These are all the substantial questions. There remain two or three minor matters, which perhaps we ought to notice. Plaintiff asked the defendant if he had not been in almost constant litigation for the last seven or eight years. Again, in deciding a question on the admissibility of testimony, the court stated the rule of law applicable to cases of this kind, and followed it by a statement of its own experience while engaged in the practice. As the court overruled the above question, and as the rule announced was in harmony with that given in the instructions, and which we have just now examined and approved, and as the experience stated was also in accord with that rule, we cannot think that the substantial rights of the defendant were in any way prejudiced.

Again, it is insisted that the court erred in requiring the defendant, at the instance of the plaintiff, to take two or three papers and read them in the hearing of the jury. As the principal fact of negligence charged against the defendant was the failure to read when he had the ability to read, proof of the latter was important, and an actual test in the court room before the jury, as permitted, was a very satisfactory and we think a proper test.

We see nothing else requiring notice. Upon the main and

pivotal questions, the ruling of the court was correct, and therefore the judgment must be affirmed.

All the Justices concurring.